Magistrate Judge Mary Alice Theiler

## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAUL ANDRES BOJORQUEZ,<br><br>a/k/a Raul Andres Bojorquez-Mimerza,<br><br>Defendant. | CASE NO. MJ16-88 MAT<br><br>COMPLAINT for VIOLATION |

BEFORE, United States Magistrate Judge Mary Alice Theiler, United States Magistrate Judge, Seattle, Washington.

The undersigned complainant being duly sworn states:

### COUNT ONE

### (Conspiracy to Commit Money Laundering)

Beginning at a time unknown, and continuing until on or about February 25, 2016 in the Western District of Washington and elsewhere, RAUL ANDRES BOJORQUEZ, a/k/a Raul Andres Bojorquez-Mimerza, and others known and unknown, unlawfully and knowingly combined, conspired, confederated and agreed together and with each other to

1  commit certain money laundering offenses under Title 18, United States Code,
2  Section 1956, as follows:

3                                (1956(a)(1))

4  (1)    Did conduct and attempt to conduct financial transactions, that is:
5  transactions involving the movement of funds by wire and other means affecting
6  interstate and foreign commerce, and transactions involving the use of a financial
7  institution which is engaged in and affects interstate and foreign commerce, which in fact
8  involved the proceeds of specified unlawful activity, that is, conspiracy to distribute
9  controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1),
10 841(b)(1)(A), and 846, knowing that the property involved in the financial transactions
11 represents the proceeds of some form of unlawful activity --

12 (B)    knowing that the transactions are designed in whole or in part --

13 (i)    to conceal and disguise the nature, the location, the source, the
14 ownership, and the control of the proceeds of the specified unlawful activity, in violation
15 of Title 18, United States Code, Section 1956(a)(1)(B)(i);

16 All in violation of Title 18, United States Code, Section 1956(h).

17

18 **And the complainant states that this Complaint is based on the following**
19 **information:**

20       I, NICOLE RICHARDSON, being first duly sworn on oath, depose and say:

21       1.    I am a Deputy with the Snohomish County Sheriff's Office and have been a
22 law enforcement officer since October 1997. From 2003 until present, I have been
23 assigned to the Snohomish Regional Drug Task Force. As of January 2012, I was
24 assigned as a sworn Task Force Officer (TFO) to the Homeland Security Investigations
25 controlled substances and bulk cash smuggling group in Seattle, Washington. While
26 employed with Snohomish County Sheriff's Office, I have attended numerous training
27 courses, including the Drug Enforcement Administration (DEA) Basic Narcotics
28 Investigators course, DEA Clandestine Laboratory Training, California Narcotic

Investigators Training Courses, and many specialized courses in narcotics trafficking investigations. In addition, I have participated in hundreds of drug investigations and multiple wire intercept cases. Due to this experience and training, I am familiar with common methods of investigating drug trafficking and manufacturing organizations, and have become familiar with the methods of operation of drug traffickers and manufacturers, including, but not limited to: their methods of importing, exporting, storing, concealing, and packaging drugs; their methods of transferring and distributing drugs, their use of cellular telephones and telephone pagers; their use of numerical codes, code words, and counter-surveillance; and other methods of avoiding detection of law enforcement. I am also familiar with the various methods of packaging, delivering, transferring, and laundering drug proceeds. I am trained to use a field test kit to identify the presumptive presence of controlled substances.

2. I have also served as the case detective or co-case detective on several long-term Federal Investigations where parallel financial investigations have been implemented. I have attended money laundering courses and a Parallel Financial and Criminal Investigations training class. I am familiar with the ways in which drug traffickers use businesses, real estate purchases, vehicle transactions, banking transactions, false employment, and monetary instruments to conceal and launder their proceeds derived from illegal drug trafficking. I also know from training and experience that the criminal proceeds made through drug trafficking is spent, deposited, loaned, traded, or transferred through financial institutions, businesses, and persons. This transaction of criminal proceeds is necessary for the drug trafficker to benefit financially from the illegal activity and allows them to finance some or all of their living expenses.

3. The recitation of facts below does not include everything known to me about this investigation, this crime, or this Defendant. I have only included sufficient facts necessary to establish probable cause that this Defendant committed the crime charged in this Complaint. Significant additional details have been omitted for the sake of brevity, as this has been a very long and complex investigation.

## SUMMARY OF THE INVESTIGATION

4. Investigators believe Raul Andres BOJORQUEZ is a large scale money launderer working for an international Money Laundering Operation (MLO) operating throughout several regions of the United States. The investigation to date has established that BORJOQUEZ and others travel to various regions across the United States, including to this judicial District. While at these various locations, these individuals collect suspected illegal drug proceeds in cash. They then deposit the cash proceeds into various bank accounts at different Wells Fargo banks. The proceeds are then withdrawn at bank branches along the Mexican border (to include specifically Nogales, AZ), and/or wire transferred to recipients in Mexico. BOJORQUEZ and the other couriers then return to Arizona and/or Mexico where they reside. The transactions are conducted by third parties (not the drug traffickers) in a manner specifically designed to conceal and disguise from the banks and law enforcement the true ownership, control, intended destination, and illegal source of the funds.

5. The initial information about this MLO was derived from separate investigations into two related Drug Trafficking Organizations (DTOs): one of which is referred to herein as the Target DTO. Both DTOs were suspected of smuggling methamphetamine and heroin into the United States from Mexico for distribution in the Pacific Northwest and elsewhere. Both organizations were also suspected of sending drug proceeds back to Mexico. As set forth below, the Target DTO is believed to be just one of the organizations for which this MLO launders drug proceeds.

### Summary of Prior Investigation and

### Cooperating Source's Reliability

6. I assisted in a prior Homeland Security Investigations (HSI) drug trafficking investigation, which culminated in the indictment and convictions of dozens of individuals in 2012. That investigation led to agents being able to contact and

cultivate a number of new Confidential Sources (CSs) who have provided information about another, closely related Drug Trafficking Organization now operating in the Western District of Washington and elsewhere (the Target DTO). Their information has proven reliable.

7. Based on this CS information, Agents and Investigators from Homeland Security, the Drug Enforcement Administration (DEA), and I are currently conducting an investigation into this Target DTO's activities. Domestically, the Target DTO is headed by a Mexican citizen living in Western Washington. The other DTO leader resides in Mexico. The DTO sends heroin and methamphetamine from Mexico, through Arizona and California, up into Washington State where it is sold. The Washington members of the DTO then send the illicit drug sale proceeds back to the DTO members in Mexico, so that they may obtain more drugs and continue their criminal enterprises.

8. Specifically, among others, *Cooperating Source-6* (CS-6), provided investigators with intimate details regarding the Target DTOs drug operation in Washington State at the time of his/her debrief.[1] This information included the location of the main suspected drug stash house in Washington at that time and frequency of drug deliveries to the stash house. CS-6 was personally aware of this information from his/her previous dealings with the Target DTO. Verification of much of this information was achieved through database and records checks, surveillance by Agents, police reports and comparison to information previously given by other Confidential Sources. For example, Agents have verified the names of the individuals provided by CS-6, and their residences, and many of their vehicles.

9. Specifically, CS-6 told Agents/ Investigators that the primary Target DTO drug and money "stash house" in late 2014 was (at that time) located at a specified address in Everett, Washington, and that the DTO members drove specific vehicles that

---

[1] CS-6 has one felony conviction for Controlled Substance-Manufacturing/Delivery/Possession with Intent to Distribute. CS-6 has one Gross Misdemeanor conviction for Reckless Driving. CS-6's motivation in assisting law enforcement is to receive leniency on criminal sentencing, to receive immigration benefits and also monetary.

COMPLAINT/BOJORQUEZ- 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

were parked at that address. Agents' surveillance observations confirmed and verified these facts.

10. On a date in July, 2014, Investigators witnessed a Washington plated vehicle arrive at this Everett stash house. Investigators saw a Hispanic male driver exit the vehicle and enter the residence carrying a dark-colored duffle bag. Within an hour, the same man was seen exiting the residence and then accessing the rear seat of the vehicle. He then entered the vehicle and drove away.

11. Investigators followed it and requested that a Sheriff's Deputy conduct a *Terry* Stop on the vehicle. A drug K-9 was applied to the vehicle and showed a positive reaction/alert for the odor of narcotics. A Washington State search warrant was obtained for the vehicle which resulted in finding a duffle bag in the rear seat containing $200,080, which was then seized. Within the stacks of currency a small baggy of suspected heroin was located.

12. Through this seizure, Agents confirmed that the Target DTO is smuggling illicit drug sale proceeds south from Washington State to Mexico. This is just one example of similar conduct. To date, in the investigation of this Target DTO, over $800,000 in U.S. Currency has been seized during traffic stops linked to members of the Target DTO.

13. In August, 2014, Investigators debriefed CS-6, during which he/she stated the Target DTO Leader was going to rent or use a different location in order to store his vehicles and load and unload contraband from smuggling vehicles. On September 2, 2014, Investigators followed the DTO Leader from the Everett stash house to a different location in Everett, Washington, which has multiple buildings, with each building having multiple units (hereinafter, Target DTO Leader Location).

14. After this happened, Investigators observed the Target DTO Leader at the Target DTO Leader Location multiple times. Investigators also saw vehicles belonging and registered to the Target DTO Leader parked at that location on a regular basis.

15. On a date in November, 2014, Investigators monitored CS-6 as he/she went to the Target DTO Leader Location in Everett. Once there, the Target DTO Leader invited CS-6 inside and the two spoke for some time. During that time, in pertinent part, he told CS-6 that a load of heroin was due to arrive from Mexico that coming week. He invited CS-6 to come get heroin once the incoming load of drugs arrived. This conversation was recorded.

## IDENTIFICATION OF BOJORQUEZ

16. On December 9, 2014, I drove by the Target DTO Leader Location. Parked in front of the door was a white colored SUV, Washington License plate AST1649. Surveillance showed this vehicle arrived at about 2:57pm. Two subjects exited the vehicle and went inside. At approximately 6:11pm, this vehicle was seen leaving the location.

17. A Washington State Department of licensing records check showed this was a rental vehicle owned by EAN Holdings LLC out of Renton, Washington. This is the name of a business to which rental vehicles owned by Enterprise, Alamo and National car rental companies are registered.

18. Records obtained from National Car Rental show the vehicle was rented on December 9, 2014 at the National Car Rental location in downtown Seattle, Washington, and was scheduled to be returned to this location on December 11, 2014. The rental record listed the renter as Raul BOJORQUEZ, later identified as Raul Andres BOJORQUEZ via his Arizona Driver's License, and also identified as Raul Andres BOJORQUEZ –Mimerza based on U.S. Immigration Records (hereinafter BOJORQUEZ).

19. On December 11, 2014, I went to the National Car Rental location where BOJORQUEZ was scheduled to return the vehicle and was advised it had been returned the night prior at the SeaTac International Airport location.

20. Records checks on BOJORQUEZ revealed he had been contacted in the past by law enforcement attempting to smuggle marijuana into the United States and US Currency out of the United States without declaring it. In addition, records show BOJORQUEZ regularly crosses the US/ Mexican border and stays for short periods of time.

## FINANCIAL INVESTIGATION OF BOJORQUEZ

21. The following information pertaining to the financial investigation was obtained from an experienced and specially trained financial investigator who has been conducting the financial records review in this investigation. According to the Bank Secrecy Act, Financial Institutions are required to report to FinCEN on a Currency Transaction Report (CTR) any deposit, withdrawal, exchange of currency, or other payment involving a cash transaction greater than $10,000. The financial institution must record identifying information of the individual conducting the transaction, to include name, address, phone, DOB, SSN, occupation, and the number of identification presented, such as a driver's license or passport.

22. A records check of FinCEN revealed that between August 2014 and February 2016, BOJORQUEZ has conducted at least 317 cash deposits in amounts greater than $10,000 in banks across the United States, generating a CTR by the financial institution. These CTR transactions total more than $1.5 million.

23. Once these bank accounts were identified, additional records were requested via Grand Jury subpoenas, including surveillance photos of deposits when available. The retention period for bank surveillance photos varies between financial institutions, however typically is not more than 90 days. Therefore, photos of each deposit identified were not always available.

24. The additional bank records show additional cash deposits. For example, one account that BOJORQUEZ made a $38,000 cash deposit to had an additional six cash deposits totaling $39,970 within two months of the deposit made by BOJORQUEZ. Each of these six additional cash deposits, however, were in amounts less than $10,000

and no surveillance photos were available, therefore it is unknown who conducted these transactions.

25.     Further, BOJORQUEZ maintained at least two bank accounts in his name in 2014 and 2015. Deposits to his Wells Fargo Bank account totaled more than $41,000 in 2014, however, Wells Fargo has not provided items detailing the source of those funds. During 2015, at least $10,700 in cash was deposited to the Washington Federal Bank account owned by BOJORQUEZ.

26.     In August 2014, Currency Transaction Reports and surveillance photos show that BOJORQUEZ deposited a total of $198,000 cash into five different Wells Fargo bank accounts over two different days. Each account was in a different person's name, and all transactions occurred in Washington State.

27.     On November 5, 2014, bank records indicate that BOJORQUEZ deposited $45,000 into a Wells Fargo account, which belongs to Monica Sanchez, a resident of Nogales, Sonora, Mexico at the Mill Creek, WA branch. Two days later, on November 7th, BOJORQUEZ made three $40,000 cash deposits at different Wells Fargo branches in Washington: Everett, Seattle, and Lynnwood. A surveillance photo of the cash deposit made at the Lynnwood branch confirms BOJORQUEZ as the depositor however a Currency Transaction Report could not be located. It is unknown how many additional cash deposits BOJORQUEZ may have conducted where the financial institution failed to file a CTR.

28.     On November 10th, BOJORQUEZ made three additional cash deposits to three additional accounts, in the amounts of $45,000, $40,000, and $40,000 respectively, in the Seattle area. For the $40,000 deposit made at the Market Street branch, BOJORQUEZ provided his full name, no phone number, and date of birth of June 2nd to Wells Fargo. For the $45,000 deposit made at the Queen Avenue branch, he provided his full name, phone number, and date of birth of February 6th. For the $40,000 deposit at the Greenwood Avenue branch he provide the name Raul M Andres, his phone number, and a date of birth of February 6th. The changing or variations of information provided to

1  the financial institutions complicates the ability to search FinCEN for additional
2  transactions. It is likely that additional transactions conducted by BOJORQUEZ exist,
3  but have yet to be located based on the known name variations and information he has
4  provided.

5      29.    On December 8, 2014, BOJORQUEZ made three cash deposits totaling
6  $119,655 at the Glenview, IL branch of Wells Fargo, the Evanston, IL branch, and the
7  Van Wert, OH, branch. For each of these transactions, he provided the name Raul A
8  Mimerza to Wells Fargo.

9      30.    On December 23, 2014, BOJORQUEZ deposited $39,920 cash to the
10 account of Jose Noriega at the Prospect, CT branch. The same day, BOJORQUEZ
11 deposited $40,000 cash to another account at the Middletown, CT branch and $39,800 to
12 a third account at the Rocky Hill, CT branch.

13     31.    In December 2014 bank records indicate that BOJORQUEZ made nine
14 deposits into various person's bank accounts at Wells Fargo banks in Ohio, Illinois,
15 Washington, and Connecticut. These deposits totaled $347,995.

16     32.    During a trip in December 2014 to Washington, HSI Seattle Agents saw
17 BOJORQUEZ at the Target DTO Leader's location in Everett. As described above, this
18 location is used and controlled by the leader of the Target DTO, and he is known to
19 distribute heroin from there.

20     33.    On December 16, 2014, a Pen Register/ GPS Tracking order obtained in the
21 Western District of Washington, United States District Court, for BOJORQUEZ's phone,
22 520-906-0532. This phone number was the number he provided during numerous bank
23 deposits. This is a cellular telephone with service provided by AT&T. The subscriber for
24 the phone is Raul A. BOJORQUEZ at an address in Nogales, AZ. This account was
25 established on 11/11/13.

26     34.    On January 6, 2015, based on border crossing and flight records, Agents
27 learned that BOJORQUEZ returned back into the US and flew from Tucson, AZ to
28 Columbus, OH the next day.

COMPLAINT/BOJORQUEZ- 10

35. On January 8, 2015, based on his cellular phone's GPS movement from Ohio to Chicago, agents suspect BOJORQUEZ acquired a rental car and drove to Chicago, IL. That same day, a Currency Transaction Report shows that a $45,000 cash deposit was made to the Wells Fargo account of Juana Duran Villanueva at a branch in New Haven, IN, by an individual named Saul Andres Sandoval. The phone number provided by the depositor, 520-906-0532, is the number that has been used by BOJORQUEZ when he has made other large cash deposits. Further, bank surveillance photos confirm BOJORQUEZ was the individual making the deposit. The following day, a CTR shows that BOJORQUEZ went to a Wells Fargo in Elmhurst, IL and deposited $44,000.00 to the account of Erika Acedo. Later, a CTR showed that he stopped at a Wells Fargo bank in Glenview, IL where he made another $44,000.00 deposit to a different account. A review of Acedo's bank accounts revealed that $178,120 in cash has been deposited to Acedo's account from September 2014 through January 2015, of which at *least* $89,000 can be directly attributed to BOJORQUEZ.

36. Based on the data received on BOJORQUEZ's cell phone, HSI Agents learned that BOJORQUEZ left Arizona on the afternoon of February 16, 2015 and flew to Seattle, WA. Further, bank records show that he made a $500 cash deposit to his own bank account in Lynnwood, WA on February 17, 2015.

37. On February 17, 2015, at about 2:44 p.m., BOJORQUEZ's phone's GPS showed him in downtown Seattle, Washington, near the Wells Fargo Bank located at Fourth Avenue and Pine Street. Special Agent Dahlstrom went to the Wells Fargo Bank and saw BOJORQUEZ, whom SA Dahlstrom recognized from BOJORQUEZ's U.S. Passport Application photo, walk out of that same Wells Fargo Bank lobby. SA Dahlstrom followed BOJORQUEZ to the bank garage and saw him get into 2015 silver Toyota Camry, Washington License Plate ASU8547. A records check on this vehicle showed it is a 2015 Toyota Camry silver in color registered to Dollar Rental Car. SA Dahlstrom was unable to maintain surveillance on BOJORQUEZ as he drove away.

38. Wells Fargo Bank records reveal that a $40,000 cash deposit was made on February 17, 2015 to the account of Rosalia Perez Castillo, an individual with an address in Mexico. The deposit was conducted at the Fourth Avenue branch in Seattle, and depositor was identified by Wells Fargo as Saul Andres Lopez. Based on the name similarity and date of birth provided, this is believed to be BOJORQUEZ.

39. The same day, five cash deposits totaling $48,000 were made to the Wells Fargo Bank account of Luz D Chavez in ID, CO, KS, and WA. A CTR was filed, however no depositor information was recorded. Surveillance photos show that one of the deposits made at the Lynnwood branch of Wells Fargo was conducted by BOJORQUEZ.

40. Later, at about 7:50 p.m., based on BOJORQUEZ's phone's GPS, Agents/ Officers re-located the Toyota Camry at a restaurant in Tukwila, Washington and later followed him to a nearby hotel.

41. On February 18, 2015, Agents/ Officers began surveillance again on BOJORQUEZ's rental vehicle at the hotel. At about 9:16 a.m., SA Gallegly observed BOJORQUEZ walk to his rental vehicle, place bags in the trunk, get inside the driver's seat and leave.

42. Throughout the day on February 18, 2015, Agents/ Officers observed that BOJORQUEZ made a total of nine trips to various Wells Fargo Banks and one trip to a Washington Federal Bank in the greater Seattle area. In at least two of these trips, agents believe that BOJORQUEZ deposited large amounts of currency into accounts belonging to people other than BOJORQUEZ. In one instance, bank records showed BOJORQUEZ deposited $20,500 cash to a Wells Fargo account in the name of Rosalia Perez Castillo. This deposit was made at the Tukwila, Washington branch located at 343 Andover Park East. This is one of the locations Agents/ Officers had followed BOJORQUEZ to on this date.

43. When BOJORQUEZ left the last bank, Agents/ Investigators followed him directly to the Rental Car return at SeaTac Airport. There, he returned the car, went to

1 | the terminal and purchased a plane ticket with cash. Investigators learned that he had
2 | bought a ticket for the next flight to Phoenix, Arizona. BOJORQUEZ was observed
3 | passing through security and into the boarding area. Surveillance was discontinued at
4 | this point.

5 | 44. In March 2015, BOJORQUEZ and two others flew together to Cleveland,
6 | Ohio. There, HSI Cleveland Agents were able to conduct surveillance and observed that
7 | they all stayed in the same hotel room. Agents were unable to identify what, if any
8 | illegal activity transpired but believe this two-day trip to Cleveland in March was not for
9 | pleasure. Agents believed that at one point that possibly BORJORQEZ had identified
10 | that he was being followed as he began driving erratically and surveillance was
11 | terminated. Records show that BOJORQUEZ returned to Arizona on March 4, 2015.

## BORJOQUEZ'S INTERVEW

13 | 45. In March 2015, shortly after his trip to Ohio where agents believed
14 | BOJORQUEZ had detected being followed, BOJORQUEZ was interviewed by Border
15 | Patrol and Homeland Security Agents/ Investigators in Nogales, Arizona.

16 | 46. During this interview, in pertinent part, BOJORQUEZ admitted working
17 | for a Money Laundering Organization as a courier, laundering drug proceeds.
18 | BOJORQUEZ said once the courier obtains the cash proceeds from a local drug
19 | trafficking organization, the courier then deposits the money as directed by the leaders of
20 | the MLO. BOJORQUEZ said Wells Fargo banks are the only banks that will allow
21 | deposits to be made into an account by a person other than the account holder.
22 | BOJORQUEZ said all accounts used by this MLO are held by people who live in
23 | Mexico. Those involved in the MLO pay individuals to keep these accounts.
24 | Investigators have confirmed that most of the accounts used by the MLO are in-fact
25 | owned by people who reside in Mexico. Looking at the pattern of activity of some of the
26 | involved accounts, the accounts are opened with small amounts of money. A large cash
27 | deposit (typically, around $40,000) is made into the account, usually in another state.

Shortly thereafter, the money is either withdrawn in a state along the U.S./Mexican border, or transferred to another account and/or wire transferred to accounts in Mexico.

47. BOJORQUEZ admitted conducting this money laundering activity, on behalf of the MLO, in the Seattle, Washington, area and other regions around the United States.

**BOJORQUEZ RESUMES WORKING FOR THE MLO**

48. Following this interview, after several months of not seeing any banking activity by BOJORQUEZ, in January 2016, Investigators found additional Currency Transaction Reports indicating seven cash deposits made by BOJORQUEZ, providing his full name and phone number as the depositor, in various Wells Fargo banks in several different parts of New York between January 19 and 20, 2016. The total amount for these deposits was $263,700. As in previous deposits by BORJORQUEZ, the deposits were made into various accounts in other persons' names and for even dollar amounts. The telephone number BOJORQUEZ gave to the banks while making these deposits was also the same that he had been using since 2014, 520-906-0532.

49. In February 2016, based on Currency Transaction Reports filed with FinCEN, it appears as if BOJORQUEZ returned to New York. Between February 2 and 4, 2016, he made four separate deposits totaling $149,000 at Wells Fargo Banks in New York, New York. These deposits were respectively for $38,000, $40,000, $40,000, and $31,000. Two of these deposits, totaling $71,000, were into an account belonging to Carlos Abraham Ladslao Alvarez and the other two deposits were into accounts belonging to Carlos A. Sanchez and Cesar E. Ruiz-Gaxiola. All account holders have Mexico based phone numbers.

50. On February 11th and 12th, 2016, CTRs show that BOJORQUEZ made an additional six cash deposits totaling $240,000 at different Wells Fargo Bank branches in the New York area. One deposit was made on the 11th and the other five deposits were made on February 12, 2016. As of February 24, 2016, the February 12th transactions are

the latest available records in FinCEN. It is unknown if BOJORQUEZ has conducted any bank transactions in the past two weeks.

**BOJORQUEZ RETURNS TO WASHINGTON IN FEBRUARY, 2016**

51. On February 24, 2016, BOJORQUEZ arrived in Seattle, Washington. On February 25, 2016, agents observed him meet with three unknown Hispanic males in Marysville, Washington. Later that same day, agents observed him meet an unknown female in Lynnwood, Washington, and saw her place a bag into his car. He was arrested later that night and agents seized a large quantity of currency (which has not yet been counted) that he had received during these two meetings.

**THE MONEY LAUNDERING ORGANIZATION**

52. In reviewing bank records tied to BOJORQUEZ and others, the financial investigator working on this investigation has identified numerous Wells Fargo Bank accounts that appear to have been used by the MLO as recipient accounts in which couriers have been making their deposits. The majority of these accounts are owned by subjects who reside in Mexico.

53. Bank records indicate that several different couriers have been identified as making deposits into these accounts at various Wells Fargo Banks across the United States. Thereafter, records indicate the money is either immediately wired to individuals in Mexico or withdrawn in cash by the account holder at branches along the US side of the Mexico border. Presumably, it is then smuggled back to the members of the originating DTO, or someone else on their behalf, in Mexico.

54. Agents/ Investigators believe BOJORQUEZ and other couriers are travelling into the United States to different cities and states in order to collect illicit drug sale proceeds and structure their deposits into different banks branches, and into multiple accounts in the names of multiple different people, in order to launder the money for Mexican DTOs. Specifically, by sending outside couriers to make the cash deposits, and depositing the funds into numerous different accounts in different names, the funds can be transferred to Mexico or nearer to the Mexican border in a manner that fully conceals

their true ownership and control (by the DTO), and disguises the illegal source of the funds. Once split into these various accounts in the names of Mexican individuals who are not involved in the DTO's activities in the United States, the funds can be withdrawn or wire transferred as directed and returned back to the DTO in Mexico, all without ever generating a record of the DTO's actual ownership and control of the funds and without any official records of the illegal source of the funds.

55.  To date, millions of dollars in deposits have been identified as having been laundering by this MLO in this manner since April 2014. Investigators believe this money is drug proceeds, collected and laundered on behalf of various DTOs by the Money Laundering Organization for which BOJORQUEZ works as a courier. Of this money, over $1.5 million dollars can be traced directly to deposits made by BOJORQUEZ.

## Conclusion

56.  Based on the above facts, I respectfully submit that there is probable cause to believe that RAUL BOJORQUEZ did knowingly and intentionally conspire with other members of the MLO and members of the client DTOs to commit money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(h), and other related statutes.

Nicole Richardson, Complainant
Task Force Officer
Homeland Security Investigations

1
2
3       Based on the Complaint and Affidavit sworn to before me, and subscribed in my
4   presence, the Court hereby finds that there is probable cause to believe the Defendant
5   committed the offense set forth in the Complaint.
6       Dated this 26 day of February, 2016.
7
8
9
10                                                  The Hon. Mary Alice Theiler
                                                    United States Magistrate Judge
11
12
...
28

COMPLAINT/BOJORQUEZ- 17